Hyundai Motor America So you think that Sanyo, by virtue of this agreement, can choose to effectively license its foundry customers and its lessees to engage in otherwise infringing activity. A form of licensing. Why is that not substantial? Let me separate out those two. As far as the lessee rights, that's really no different than what a non-exclusive licensee normally gets the right to do. So under that theory, every non-exclusive licensee who has the right to make, use, or sell a product gets a right in some sense to sub-license to its customers by handing them the product that they are licensed to make. So I don't think that's substantial. But that's why I did focus on the word lease as opposed to sell. Exhaustion would give a practitioner's sale customers, its purchasers, that right. But this gives Sanyo the right to allow me, if it leases me something or if it makes something for me, that the background law, including the law of exhaustion, does not give. So Sanyo has the ability to say, diamond coating, you don't get to control whether I can use and then sell this product. It can make it for me. Again, let me distinguish between the lessee rights and the foundry rights. As far as the lessee rights are concerned, it still has to be a Sanyo product. I mean, Hyundai and Kia couldn't come to Sanyo and say, please lease us our own auto parts. It's got to be a Sanyo product. And so I don't really see it as expanding much beyond the non-exclusive license. But Sanyo can effectively license me not to make but to use and sell. Isn't that a significant licensing right as their lessee or as their foundry customer? Well, the foundry rights, let's talk about the foundry rights because the foundry rights are completely different. The foundry rights in Section 2.4 make it very clear that, for example, Hyundai and Kia could not go to Sanyo and say, we've been sued, let's start buying product from you, Sanyo, because that way we can get foundry rights and be exempt from suit. Because Section 2.4 states that Sanyo may not provide those foundry rights to anyone who's under notice of infringement. But that takes care of some group, the ones who have had notice. But as to others, Sanyo can license them to use and sell. I would submit, Your Honor, that's not a substantial right. Because in that situation, Sanyo can only provide those rights to its customers who are normal customers, which is not any different than a non-exclusive right. I mean, it's not like Sanyo can go out there and freely start sub-licensing these patents, especially considering the fact that 2.4a expressly excludes sub-licensing from Sanyo's rights. I'm sorry, where's the business about normal customers? Well, it doesn't use the phraseology normal customers, but it talks about covered products, which are covered Sanyo products. So Sanyo can't go out there and start. My point being, Your Honor, that in order for someone to enjoy the 2.4a license rights that are provided here to Sanyo, they've got to be a customer of Sanyo. It's got to be a Sanyo product, which is not any different, Your Honor, than any other non-exclusive licensee who also gets the right to make, use, and sell products and thereby exempt its customers from infringement suits. Go ahead. No, Your Honor. What is your understanding of the full scope of the concept of the foundry rights? My understanding of the concept of foundry rights is like contract manufacturing. So someone comes to you and says, I would like you to make this product for me. The foundry performs and creates the product for that person, and in that sense, the product is then exempt from an infringement suit to the extent that the foundry has exclusive or non-exclusive. But these would be products that are made by Sanyo, not products that Sanyo contracts for someone else to make for Sanyo. That's correct. Sanyo is acting as the foundry. So if anyone wants to take advantage of these rights, they have to go and start using Sanyo as a foundry, which, by the way, I would note that there's no record evidence whatsoever that Sanyo actually has been acting as a foundry for anyone. So putting that aside, the license grant and the rights that are granted in 2.4a are very limited and don't give Sanyo any right to indulge infringement because once infringement comes up, once it's identified that there is an infringer, Sanyo can't provide those foundry rights. I see that my time has expired. Any other questions? Okay, counsel. Mr. Hill? Yes, good morning, Your Honor. I'm Reggie Hill with Jenner & Blocker on behalf of Nissan. I'm going to argue for the defendant of Hallease. My colleague, Chad Ray, is here. Also, I want to introduce counsel for Hyundai Kia entities, James Pack and Dan Talish. May it please the court. Your Honor, under this court's standing precedent and consistent with the policy behind the potential standing doctrine, Diamond Coating Technologies, DCT, lacks all substantial rights and Sanyo should have been joined in order for there to be prudential standing. Without Sanyo, this case was properly dismissed by the district court. The situation we have here, Your Honor, is that DCT is a mere agent of Sanyo to enforce the patents and shield Sanyo from the obligations and burdens of U.S. patent litigation while providing all the benefits, including Sanyo maintaining substantial financial and ownership interests in the patents. As a practical matter, this arrangement thwarted the defendants and appellees in this case from getting routine and important discovery. For example, the defendants were not able to get conception and reduction to practice documents or testimony for the inventors, even though that had been promised. Let me ask you this. Suppose that this was a much less complicated agreement and it only had one principal provision, which was, let's say, two provisions. One is that there's a transfer of title to the patent to DCT. Two is that half of any proceeds from either the sale or the exploitation via licensing or infringement action from the patent would be split 50-50 between Sanyo and DCT. Would you say under those circumstances that not all substantial rights had been conveyed to DCT? I don't think that I would say that in that particular case as you laid it out, Your Honor. The fact that the payments for the transfer of title are in the form, in effect, of a share of the proceeds is not enough to defeat the transfer of substantial rights. I believe that's consistent with this court's precedent, that that in itself alone would not be enough. Okay. And what do you think, setting aside the sharing of proceeds, what do you think it is that, in your view, principally, most importantly, trips the wire for kicking this over into a non-substantial rights transfer? Right. So I would leave it, sum it down to a couple of things, Your Honor. I mean, first off, and the court has looked at this, for example, in the PROPAT case, the inability to be able to assign its rights under the agreement and the patents themselves. In other words, to the extent DCT has something, they have something that they can't sell or transfer to someone else without Sanyo giving its consent, which is unfettered. Well, we know they can't transfer the agreement, but why can't they transfer the assets? I think in this particular case, Your Honor, whatever was given over to Sanyo, if you look at the grant clause, was given subject to the agreement. I believe, and I'm not quoting it, but it effectively- That's true, but I mean, why does the agreement prohibit DCT from selling the assets? I believe the entire arrangement prohibits them from selling the agreements, both by the limitations on what DCT's business is. DCT's business is, in fact, limited, if you look at the agreement, to licensing, enforcing- They can't practice it, in other words. They can't practice it, the invention, and they can license and litigate. Then there's a clause that says you can't do anything else. This is an ongoing operation that can do what it wants to do. It's limited in what it can do. Then I believe that the security interests that were recorded against the patent, and there's no clear way to erase the security interests, anyone taking the patents- Theoretically, if they were to make an assignment without Sanyo's consent, anyone taking the patents would certainly be taking them subject to whatever rights Sanyo has and whatever the agreements has. They would have the security interests that would prevent further transferring the agreements, or at least encumbering the agreements in that matter. As I see it, as a practical matter, the only way they could actually transfer the patent assets themselves is if Sanyo consents. That's certainly the only way I would advise any client of mine to purchase these particular assets. I believe that's one issue. I also believe that the questions that Your Honors touched upon in terms of the ability of Sanyo to actually give some licenses is also important. It's a very substantial right. I view the foundry rights in addition to the have-made rights that Sanyo has under the license gives Sanyo, except for the narrow exception pointing out where there's been notice of infringement, that Sanyo can both make products for somebody else, so they could make products for Nissan and Hyundai if they had not been sued on notice of infringement, or they could in fact have their suppliers make products for Sanyo that Sanyo could then sell as Sanyo products. So I do believe this is different than the other cases in the court's precedent where there have not been substantial rights in the sense that there are substantial rights of licensing here. Are the foundry rights limited solely to Sanyo making the materials? I believe that the foundry rights are limited to Sanyo making, but in fact they have have-made rights as well, so Sanyo can have other products under the patents made for them. Your opposing counsel said there was no evidence that Sanyo actually had, I think he said that Sanyo had foundry capability. Is that true? Your Honor, we've had no access to Sanyo and what their ability is. That's part of the problem with this lawsuit, so I don't have any idea what Sanyo in fact is able to do. Fair enough. Now, with respect to the rights that Sanyo has retained vis-à-vis any licensing, how would Sanyo's position, let's set foundry rights aside for a moment. How is Sanyo's position any different from that of any non-exclusive licensee? It's a good question, Your Honor. I believe that if you set aside the foundry rights, and the have-made rights I think are important too, there certainly have been other cases in this court where that type of ability to sub-license, I think for example the Luminara case that the court recently had before it, there was some ability for Disney in that case to do some licensing to affiliates and to other people that were associated it. And that sounds a bit more similar to that circumstance than the circumstance we have in this case on that particular issue. Well, if for example I'm the transferor of the title to the patent, but I retain a non-exclusive license, that itself wouldn't be a substantial right retained if it's sufficient to defeat the transfer of title, I gather, and the standing would not be a problem for the transferee, correct? I believe that's consistent. So, and I make products, I sell them to people under my non-exclusive license, they clearly can use the products without a fear of infringement suits, right? Absolutely, Your Honor. Okay, and I'm just wondering what it is in your view that puts Sanyo in a different position from someone in my position. I believe what's different is the foundry rights, quite frankly, Your Honor, because although those would be products that were made by Sanyo and then sold to downstream customers, but we have the opportunity for Sanyo to make a product, let's say we're in the automotive industry, for General Motors that could then be sold. And so they have an additional right to provide others, not just their own customers, but they could make products for others. So, for example, let me give you an example. Don't those people become their customers? I mean, if they're making the products, yes, it's true that they are contracting with someone to provide them with the, in some form, the products, but their own selection of folks to whom to sell is all covered by the license, right? A non-exclusive license. I believe that's right. I want to step back, though, and say what if it were our supplier, Schaeffler? So, say, for example, somebody supplies pistons to the automotive industry. Sanyo is not in that business of supplying those to the automotive industry. I don't know if they are or not. It's a hypothetical. But because of the patents and the rights that they have in terms of a license, including the rights to foundry, then Sanyo could make that product for the supplier, Schaeffler, and Schaeffler could sell that to the entire automotive industry. So, therefore, they have some ability to indulge infringements, if you will, that DCT does not. Is it the norm in retaining a non-exclusive license that the transferee doesn't have a right to practice the patent in suit? I think it is somewhat. It is abnormal for the transferee, Your Honor, not to be able to practice the patent in suit. Excuse me, that distinguishes it as well. Right. I've never finished my list of distinguishing, but, in fact, not being able to have the right to practice the invention, there's also some level of control that is being maintained by Sanyo with regard to who gets sued and who doesn't get sued. It seemed you were relying solely on foundry rights, and I thought there was more. I apologize, Your Honor. No, we're relying on all the rights set forth in our brief, both individually and cumulatively, with respect to this particular situation, because that's what the court's precedent has looked at. And so I started out with that, but certainly the right to practice or the inability of DCT to actually practice the invention is very important. Also, I think what's very important in this particular case are the broad reversionary rights that there are in the actual assets themselves, so that it seems no matter what happens, these assets end up back with Sanyo. So, for example, if they fail to maintain the patents and prosecute the patents, there are provisions that allow Sanyo to either step in and do the prosecution through them, or it requires them to give the patents back to DCT. If DCT decides it doesn't want to exploit the patents, and I know you've read the briefs, but they need to exploit these patents sort of in the best interest of Sanyo and DCT, and that's a different circumstance than what's in the court's precedent as well. Who determines the best interest? That's a very good question, Your Honor. I think if Sanyo writes them a letter and says it's in our best interest that you do X, Y, and Z, I believe they are required to give that some consideration or those words don't have meaning in the agreement. And those words are important, I think, to the agreement. So what is in the interest of Sanyo? We know that they identified some particular targets at some point, and we know that they also allowed DCT to exclude certain people from being sued. And so all of those things, which relate to who gets sued under these patents, are being collectively controlled by Sanyo and DCT on some level. Of course, if Sanyo had sold the patents outright to DCT in exchange for a large chunk of DCT stock, then I suppose DCT would be obliged by principles of corporate governance to act in the interest of the shareholders, and that would mean that they would not be able to do things that were adverse to the interest of this large shareholder that has just transferred the patent, right? I mean, I'm wondering whether the act in the interest of Sanyo really goes any farther than a different kind of arrangement would go, which would clearly not be a retention of an interest. I believe it goes very far. I mean, obviously corporate officers have some fiduciary obligations. I think those are different. They relate to sort of the corporation itself. Here we have the shareholders themselves, absolutely. Here we have a situation where DCT sort of has color of title and is a separate operation, and we both have Sanyo limiting their corporate operation. At the same time, they have to act in the best interest of Sanyo and DCT, whatever that is, with relation to commercializing these particular inventions, which really means licensing and litigating these particular patents. What is it about the term exploiting, I think it's exploitation or exploiting the patents, that leads you to believe that that does not include the possibility of transferring the patents for, if that turns out to have been the wisest commercial course for DCT. Right. So if you turn in the agreement, at least we've made several arguments, Your Honor, on this particular issue. And the first one is the whole character of the agreement, if you read it, is about licensing and litigating. I understand. But if push came to shove and they just decided this licensing business is not doing well, but we have somebody that's willing to pay what we regard as a vastly overmarket value for these patents, what is it that tells you in the agreement that DCT couldn't do that, even though they would conclude that that was very much in their interest and that of Sanyo? Right. Because they would transfer half of that very large proceeds to Sanyo. Right, Your Honor. You know, as you say the question, what I would, as you ask the question, my answer would deal in practicalities, quite frankly. And I believe that there's language about exploit that we've raised in our brief. But sure, if someone showed up with a ton of cash, which is actually what these parties set out to do in the very beginning before they got to this arrangement, to sell those patents, I believe that there might be an arrangement that could be struck. But there's nothing in this agreement that determines what those arrangements would be. And, in fact, Sanyo would have to give its consent to that arrangement at that time. And I believe that the parties would work it out at that time. But if DCT came in and said we're exploiting the patent, what better form of exploitation than to get more than you could possibly get by licensing? Would there be an answer in the four corners of the agreement to where you would conclude they could not do that, no matter how advantageous a commercial transaction might be thought to be? I believe there is evidence that would be argued that they could not do that based upon the agreement. And what would that textual evidence be? I'm sorry, Your Honor, that would basically be in 5.1, there are certain activities for DCT that are limited. So DCT's business shall consist of the prosecution, maintenance, licensing, litigation, enforcement and exploitation of the assets. Well, the exploitation, of course, is the key word there. And exploitation, if you look in 5.1.4, at least, Your Honor, there's one statement there that says in the middle of 5.1.4, in the event DCT determines it will no longer exploit a family of patents within the assets, DCT shall notify Sanyo and give Sanyo a 90-day option to acquire DCT's rights to the family for the consideration of only $10. It goes on. My point being that exploit, as used in that particular part of the paragraph, could not mean selling the assets, because if they stopped exploiting them, if exploit meant selling them, then they wouldn't have anything to return back to Sanyo, as contemplated in this paragraph. So we don't believe, if you read this entire agreement, that you come away with the idea that there was some ability to sell the patents. And if you compare it with the other agreement, in fact, the other agreement was very explicit about selling the patents.  Thank you, Your Honor. Thank you, Counsel. Your Honors, I'd like to just hit a couple of the substantial rights that my colleague mentioned. The first thing I mentioned, my colleague mentioned, was that Sanyo controls the ability to assign, and that DCT has no ability to assign, and Sanyo's consent rights are unfettered. My colleague, unfortunately, I'm afraid, is mistaken. Section 9.12 of the agreement states expressly that any time a consent is required in the agreement, that consent cannot be unreasonably withheld. And Judge Bryson, you held in the speed play case that assignment clauses that are conditioned upon the reasonable withholding of consent do not give rise to a substantial right. So even if we want to interpret Section 9.6 as limiting the ability of DCT to assign the patents without the consent of Sanyo, per speed play, that's not a substantial right because Sanyo has to give, cannot unreasonably withhold its consent. You misspoke yourself, Counsel. I'm sorry. The court held. The court held. Yes, Your Honor. The second right that my colleague referenced was the right, the alleged absence of any right within DCT to practice the patents. The license doesn't, or the assignment agreement doesn't say that DCT is not allowed to practice the patents. And, in fact, that entire proposition is entirely inconsistent with Section 2.4. In Section 2.4, DCT grants to Sanyo a non-exclusive right to practice the patent. Well, if DCT didn't have a right to practice the patent, how could DCT have granted a license to Sanyo to practice the patent? On top of all that, I would direct Your Honor's attention to Article 1, the definition of gross proceeds. The definition of gross proceeds within Article 1 says that DCT has got to pay all of these monies over to Sanyo, including any cash it receives from the, quote, use of the patents, close quote. And use is distinguished from litigation, licensing, all those other things. So there is no express prohibition against DCT practicing. DCT has to pay 50 percent of all of its revenues from the use of the patents. And there is no possible way that DCT could grant a license to practice to Sanyo unless DCT had the right to practice. So, in our opinion, there is no right to practice that resides within DCT. On the issue of exploit, the question was raised as to whether or not the exploitation rights that DCT enjoys include the right to sell the patents. And Sanyo itself has argued, what does exploit mean? Exploit means make productive use of. A definition I'm willing to embrace, if you look at Schedule B to the patents, Schedule B is the compensation arrangement under this agreement. Schedule B says Sanyo shall be paid for the, quote, productive use, close quote, of the patents based upon 50 percent of the gross proceeds. And how is gross proceeds defined? It includes cash that is made via the purchase of the patents. Someone else purchasing the patents, paying DCT money, in that case Sanyo gets 50 percent of those gross proceeds. So Schedule B makes it clear that exploit is associated with the concept of selling the patents based upon Sanyo's own definition of exploit, which is to make the productive use of. Per Schedule B, making productive use of something includes selling it. Lastly, with respect to the issue of acting in the best interest of Sanyo, again, I would emphasize... What's the difference between selling and practicing? Selling the patents would be to offload the asset. Practicing the patents would be to use the patents and create some sort of product with them. I'm sorry, go ahead. The agreement specifically provides DCT shall engage in no business or activity other than the business, and the business is prosecution, maintenance, licensing, litigation, enforcement, and exploitation, but not actually practicing. Well, Your Honor, by the definition that Sanyo even uses of exploitation, exploitation means to make productive use of something. I would submit that practicing a patent is plainly making the productive use of something. You are using the patent to make a product. I mean, exploit has got to mean something, Your Honor, beyond litigation and licensing, because litigation and licensing are separately identified in Section 5.1.1. So we have to struggle with what exploit means, and it logically means both using the patent to practice something and selling it per the other terms of the agreement. I'll let you wrap up. Actually, could I ask quickly just a question? I did not have the page before me when you were talking about Schedule B financial terms, and I thought you had said that there was a reference to purchasing of patents in Schedule B. Yes, Your Honor, it's a two-step point. Sanyo shall be paid based on the productive use of the patents, and Sanyo is defined productive use to mean exploit. Then it says 50 percent of adjusted gross proceeds. Gross proceeds is a defined term. Where is that defined? You flip back to Article 1, gross proceeds, on record page A0201. Gross proceeds is defined, and there's quite a bit of language, but if you get down to Paragraph B or subsection B, shall include any cash, blah, blah, blah, blah, blah, including relating to the purchase of the assets. So Schedule B refers to gross proceeds. Gross proceeds is money from the purchase of the assets. Thank you, Your Honor.